MELANIE RIVIERE

VERSUS

BERND BELLO

NO. 23-CA-372

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 838-561, DIVISION "G"
HONORABLE E. ADRIAN ADAMS, JUDGE PRESIDING

May 17, 2024

**JOHN J. MOLAISON, JR.**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, John J. Molaison, Jr., Scott U. Schlegel, and Timothy S. Marcel

**<u>REVERSED; ORDER VACATED</u>**
  **JJM**
  **SMC**
  **JGG**
  **TSM**

**<u>DISSENTS WITH REASONS</u>**
  **SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUB RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
BERND BELLO
     T. Carey Wicker, III
     Thomas C. Wicker, IV

COUNSEL FOR PLAINTIFF/APPELLEE,
MELANIE RIVIERE
     Melanie Riviere

**MOLAISON, J.**

The appellant, Bernd Bello, seeks to review the order of protection entered by the trial court on April 17, 2023. For the following reasons, we reverse the trial court ruling and vacate the protective order.

## FACTS AND PROCEDURAL HISTORY

This appeal stems from a Petition for Protection from Stalking or Sexual Assault filed by the plaintiff/appellee, Melanie Riviere, against Mr. Bello, the defendant/appellant, on March 10, 2023. In this petition, Ms. Riviere alleged that Mr. Bello had an approximately two-year history of "unwanted advances romantically and/or requesting friendship," that he had exhibited "stalking behaviors," and that his behavior towards her had "become obsessive." She stated that she could provide witness statements regarding Mr. Bello's "bizarre behavior." The petition alleged past incidents of the defendant obtaining her phone number and her resident address, sending flowers to her home, following her to her car, and confronting her as to why she had not spoken more than twenty words to him in the past year, and attending the same dance class. She stated that the dance class instructors felt that Mr. Bello had a "personality disorder and requested [she] seek out a restraining order after also witnessing his behavior." In addition, Ms. Riviere listed her two minor children as protected persons, although she made no allegations involving the children. Ms. Riviere requested a Temporary Restraining Order ("TRO") prohibiting Mr. Bello from contacting her by any means or going within 100 yards of her home and place of employment. Ms. Riviere attached an "affirmation" to the petition stating, "I believe that the defendant poses a threat to my safety and/or to the child(ren) or to others from whom I requested relief."

On that same date, the trial court issued a Uniform Abuse Prevention Order - Temporary Restraining Order effective through March 2, 2023, granting the relief requested by the plaintiff. The court ordered Mr. Bello to appear for a

contradictory hearing on March 22, 2023. However, the court did not serve him. The court issued a second TRO on March 22, 2023, and set the hearing date on April 3, 2023.

The parties appeared for the hearing on April 3, 2023. Mr. Bello had retained counsel. The trial court granted Mr. Bello's request for continuance and reset the contradictory hearing for April 17, 2023.

The evidence presented at the contradictory hearing indicates that Ms. Riviere and Mr. Bello are members of a local social dancing community and frequent local venues to dance. Ms. Riviere, who appeared in proper person at the hearing and in this appeal, testified that in the social dance community, it is customary to dance with people who are not friends. She went on to testify that Mr. Bello has "stalked" her Facebook page, found out information about her, found her home address, sent her unwanted gifts, and followed her around "in social situations." She told Mr. Bello she had no interest in a relationship the first time he asked her out; however, he continued to ask her, and she declined. Ms. Riviere testified that as of February 9, 2022, Mr. Bello had asked her out twenty-two times. She politely declined and told him she would "reach out" to him if she had time. After further Facebook messages, she told him she did not have the time or emotional capacity to invest in a friendship.

Ms. Riviere went on to testify regarding a message sent by Mr. Bello referring to her ex-husband. She said the only way he could have had information about her and her ex-husband was for him to drive by her house to see his vehicle in the driveway. Ms. Riviere then continued to read through several "messages," at which point the trial judge went through each electronic conversation when the court admitted them into evidence. The following electronic messages were admitted into evidence by Ms. Riviere:

- September 28, 2021-- Mr. Bello sent Ms. Riviere a message asking her out to dinner. Ms. Riviere responded that she was going through a divorce and was not interested in getting into another relationship. She stated, "I really had fun with you the other night." Mr. Bello responded that he was not looking for a relationship but would like to "meet as friends" and talk about dancing.

- November 8, 2021 -- Mr. Bello offered to send the plaintiff's photography business page to some of his friends. She responded that would be helpful and thanked him. The next day, Mr. Bellow sent a message letting Ms. Riviere know there was an error in the appointment times on the photography page. Ms. Riviere responded she had fixed it.

- November 11, 2021 -- In response to flowers sent by Mr. Bello to Ms. Riviere at the address listed on her photography page, which was her home address, Ms. Riviere sent Mr. Bello a message thanking him for the flowers, stating: "That was sweet." She later sent him a message saying that she was "not romantically interested" and would "feel terrible" if she was giving the "wrong message." Mr. Bello responded that he understood and had sent the flowers as a "gesture of friendship." He stated that he enjoyed dancing with her, that she had not been giving him the wrong message, and that he would like to "be friends" and "hang out sometimes" or go dancing when she could. The plaintiff responded with a "thumbs up" to this message.

- January 13, 2022 -- Mr. Bello sent Ms. Riviere a text message stating that a band was playing in Slidell and that he hoped she could make it out. Ms. Riviere responded, "Sounds like fun."

- Early February 2022 -- Mr. Bello sent a message stating that Nashville South, the band that Mr. Bello is employed to promote, was playing at a dance hall on Friday and asked Ms. Riviere if she could attend. Mr. Bello then sent messages asking Ms. Riviere if she was "alright" and if something was wrong or if she was upset with him. He stated: "If there's something bothering you about me please let me know." Ms. Riviere responded that she is a single mother of two kids and works two jobs. She asked Mr. Bello not to "take offense," stating she was "just busy" and would reach out when she had time.

- February 14, 2022 -- Mr. Bello sent a message to the plaintiff wishing her a happy Valentine's Day and stating that he enjoyed dancing with her. He referenced their meeting around 1994, then said that it appeared that she was "afraid" to talk to him. Ms. Riviere responded that she did not have the "time or the emotional capacity to invest in a friendship right now." She then wished him happy Valentine's Day. The next day, Mr. Bello sent a lengthy message stating that he understood that she was trying to "patch things up" with her ex-husband and that he did not want to get in the way.

- February 23, 2022 -- Mr. Bello sent a text message to Mr. Riviere expressing his "hurt" over being blocked by her on Facebook,

explaining that he thought they were friends and that she kept telling him she was busy and did not have time. He stated that he wished she would have asked him to leave her alone, then wished her "all the best."

- March 8, 2022 -- Mr. Bello sent Ms. Riviere a text message stating that Nashville South was playing on March 19 for a birthday party and reunion and that he hoped she would attend. He stated "I promise I will not do or say anything to make you feel uncomfortable, just want to dance." Ms. Riviere did not respond. On March 18, 2022, Mr. Bello texted asking if she could attend the "reunion and birthday parties." Ms. Riviere did not respond.

- May 8, 2022 -- Mr. Bello sent Ms. Riviere a text message wishing her a happy Mother's Day. Ms. Riviere did not respond.

- October 8, 2022 -- Mr. Bello sent a message stating, "I don't really know what else I can do to apologize for my messages that made you feel uncomfortable. That was never my intention. I am truly sorry about that but would really enjoy dancing with you next Saturday." Ms. Riviere responded, "We are all good," and "See you then."

- December 2022 -- Mr. Bello sent a message to Ms. Riviere stating that all dancers would be at Southern Rhythm for New Year's Eve. She responded that it sounded like a "good idea."

- January 23, 2023 -- Ms. Riviere sent a message to Mr. Bello asking, "Are you going anywhere tonight?"

- February 14, 2023 -- Mr. Bello sent Ms. Riviere a Valentine's Day greeting stating that she was terrific and he was thinking of her. She responded by thanking him and putting a heart emoji in the message.

- March 9, 2023 -- Mr. Bello sent a lengthy text message to Ms. Riviere stating that he enjoyed dancing with her and wanted to improve his dancing. He said that the fact that she was "going to Fleur de Dance " impacted him showing up there for the past two weeks but that he would have gone there eventually anyway. Mr. Bello then stated that he found her attractive and that she had a beautiful smile. He elaborated that he wanted to talk to her and did not understand why she was afraid to speak to him. He asked that they feel "comfortable and relaxed around each other" and be able to have fun.

- March 10, 2023 -- Ms. Riviere sent a text message to Mr. Bello stating, "I've made it very clear that you make me uncomfortable and I'm not interested in a romantic relationship with you but you continue to pursue one. Please do not talk to me or text me, call me, ask me to dance or come to my dance class. Please do not Facebook or Instagram stalk me. Please do not find out where I live and send flowers or send anything to my home. I have tried to tell you this nicely, but clearly you're continuing to ignore my request and this is the last time I will say this. Please leave me alone." Mr. Bello

responded that he would leave her alone and hoped she would realize how hurtful this was for him. He concluded by wishing her a "good life."

Ms. Riviere testified that the day after the March 10, 2023 exchange, Mr. Bello went to the dance studio where she took dance classes. However, she admitted that he could have gone to the studio to find out her schedule "so he'd know if I was there or not," possibly so he could avoid her. Ms. Riviere admitted being unaware that Mr. Bello produced several of the events he sent to her regarding the band Nashville South playing at Rock N Bowl. She testified that she attended these events and danced with Mr. Bello more than 50 times. She testified: "He has operated in the most gentleman[ly] way on the dance floor." She elaborated that once they exited the dance floor, he was in her "personal space" and listening to "personal conversations" she was having with friends. She admitted that he never acted inappropriately with her or inappropriately touched her. She testified that he would stand two feet away and patiently wait for her to finish a conversation so they could dance again and that this behavior made her uncomfortable.

In response to questions regarding her allegation that Mr. Bello had asked her out on twenty-two occasions, Ms. Riviere responded that she considered the messages that Mr. Bello sent informing her of a dance outing and asking if she wanted to go to be "asking her out." She acknowledged that this was an invitation to meet a group and dance. Ms. Riviere testified: "When I sat down recently and sat down and looked holistically over text threads over the period of two years, it was right before me the obsessive behavior and the unusual behavior and the way that he words things. It's unusual and it's bizarre and I feel threatened."

Ms. Riviere further testified that since the March 10, 2023 message in which she told Mr. Bello to leave her alone, she believed that "he was still obsessively

tracking [my] movements and tracking what I was doing on Facebook." She did not explain the basis for this belief or produce any evidence to support it.

In response to whether she was asking Mr. Bello not to be allowed to go to Rock N Bowl, Ms. Riviere testified that she attends dance class every Wednesday and is "in competition," which requires her to practice at Rock N Bowl. After Ms. Riviere's cross-examination, the trial judge asked Ms. Riviere if she had anything else to present and if she wished to call any other witnesses, to which she responded no.

Mr. Bello testified that he had known Ms. Riviere for thirty-one years. They first met in 1994 but had not maintained contact. In September of 2021, he was at a dance hall when Ms. Riviere approached him, asking if he remembered her from the past and if he still danced. They danced that night. Mr. Bello sent Ms. Riviere a friend request on Facebook, and she returned it. Ms. Riviere had a photography page on Facebook that she invited him to follow. This page contained her home address.

He denied having a romantic interest in Ms. Riviere; he only wanted her as a dance partner. He had been dancing for thirty years, had taken lessons at various dance studios, and had danced at many different clubs. He works for Nashville South, has helped put on events by the band at Rock N Bowl, and sets up "reunion events" that he created online for dancers from the past to come to Rock N Bowl.

Mr. Bello explained that he wanted to join the dance class that Ms. Riviere was taking because they had been dancing together, and he thought it would be helpful to practice in a class together. When he discovered she did not want him to attend the class, he went to the studio to inquire about alternative dates. Mr. Bello asked to be informed if Ms. Riviere changed her classes or quit attending, allowing him to attend class. No one from the dance studio told him he was not welcome to return for classes.

He denied attempting to reach out to Ms. Riviere in any way since her March 10, 2023, message stating to leave her alone. He had not been to Rock N Bowl since the TRO was issued.

After the hearing, the trial judge stated that Ms. Riviere had "proven her case in order to get the injunction and to get the protection from stalking from Mr. Bello." The trial judge ordered that Mr. Bello not harass, stalk, follow, track, monitor, or threaten Ms. Riviere in any manner. The court ordered that Mr. Bello not contact Ms. Riviere personally or through a third party, via public posting, or by any means without the express written permission of the court. Also, the court ordered Mr. Bello not to go within 100 yards of Ms. Riviere's residence, employment, and school. The trial judge stated that this order followed Ms. Riviere, so if she was not at Rock N Bowl, Mr. Bello could go there. When asked for clarification, the court stated that if Ms. Riviere appeared at a place where Mr. Bello was, he had to leave. The court signed the order and gave a copy to Mr. Bello. This timely appeal followed.

**LAW AND DISCUSSION**

Ms. Riviere filed for an order from protection under Louisiana Revised Statutes 46:2171, et seq., known as the "Protection from Stalking Act." The act created a civil remedy for stalking victims against perpetrators, offering immediate and easily accessible protection. La. R.S. 46:2171. Under this act, "stalking" means any act that would constitute the crime of stalking under La. R.S. 14:40.2 or cyberstalking under La. R.S. 14:40.3. La. R.S. 46:2172; Scott v. Hogan, 17-1716 (La. App. 1 Cir. 7/18/18), 255 So.3d 24, 29. Notwithstanding the act's reference to the criminal stalking statutes, petitions for protection from stalking are not criminal proceedings. Instead, the reference to the criminal stalking laws in the context of a petition filed under La. R.S. 46:2171 is "to provide the definition of stalking." See

<u>Smith v. Dugas</u>, 19-0852 (La. App. 1 Cir. 2/26/20), 2020 WL 913673, (unpublished).

Stalking is "the intentional and repeated following or harassing of another that would cause a reasonable person to feel alarmed or to suffer distress." La. R.S. 14.40.2(A). The term "harassing" is defined as "the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures." La. R.S. 14:40.2(C)(1). A "pattern of conduct" means "a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person." La. R.S. 14:40.2(C)(2).

Louisiana Revised Statutes 14:40.3(B) defines the offense of cyberstalking as follows:

> Cyberstalking is action of any person to accomplish any of the following:
> (1) Use in electronic mail or electronic communication of any words or language threatening to inflict bodily harm to any person or to such person's child, sibling, spouse, or dependent, or physical injury to the property of any person, or for the purpose of extorting money or other things of value from any person.
> (2) Electronically mail or electronically communicate to another repeatedly, whether or not conversation ensues, for the purpose of threatening, terrifying, or harassing any person.
> (3) Electronically mail or electronically communicate to another and to knowingly make any false statement concerning death, injury, illness, disfigurement, indecent conduct, or criminal conduct of the person electronically mailed or of any member of the person's family or household with the intent to threaten, terrify, or harass.
> (4) Knowingly permit an electronic communication device under the person's control to be used for the taking of an action in Paragraph (1), (2), or (3) of this Subsection.

Louisiana Revised Statutes 14:40.3(B) does not define the terms "threaten," "terrify," or "harass." Thus, we must give these words their generally prevailing meaning based on context and everyday usage. La. C.C. art. 11; La. R.S. 1:3. Black's Law Dictionary, 11th ed. 2019 defines "threat" as "[a] communicated intent

to inflict harm or loss on another or on another's property ... a declaration, express or implied, of an intent to inflict loss or pain on another" and "[a]n indication of an approaching menace; the suggestion of an impending detriment." Harassment is defined by Black's Law Dictionary as "[w]ords, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose; purposeful vexation." "Terrify" means "to drive or impel by menacing" or "to fill with terror," and "terror" means "a state of intense or overwhelming fear." Merriam-Webster Online Dictionary (Merriam-Webster.com).

The cyberstalking statute defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature, transmitted in whole or in part by wire, radio, computer, electromagnetic, photoelectric, or photo-optical system." La. R.S. 14:40.3(A)(1).

At a hearing on a protective order, the petitioner must prove the allegations of abuse by a preponderance of the evidence. La. R.S. 46:2135(B). Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence, both direct and circumstantial, shows that the fact sought to be proved is more probable than not. Head v. Robichaux, 18-0366 (La. App. 1 Cir. 11/2/18), 265 So.3d 813, 816.

An appellate court reviews orders of protection under the abuse of discretion standard of review. Oliva v. Jones, 22-385 (La. App. 5 Cir. 3/29/23), 360 So.3d 573, 578. Whether to grant a protective order and the extent of protection is within the trial court's discretion. An appellate court will not ordinarily modify or reverse a trial court in such matters absent an abuse of the trial court's discretion. Id. To reverse a fact-finder's determination in an action seeking protection from abuse order, the appellate court must find from the record that a reasonable factual basis

does not exist for the trial court's finding and that the record establishes that the finding is clearly wrong.  Id.

On appeal, Mr. Bello argues that the trial court erred in issuing a protective order when the plaintiff did not establish her allegations by a preponderance of the evidence.[1]  We agree.

The evidence indicates that after dancing with Ms. Riviere in September 2021, Mr. Bello asked Ms. Riviere out to dinner.  Ms. Riviere responded that she was going through a divorce and was not interested in another relationship.  Mr. Bello explained he was looking to meet as friends and talk about dancing.  Two months later, he sent her flowers.  Ms. Riviere thanked him and explained she was not interested in a romantic relationship.  Mr. Bello responded that he understood and that the flowers were a gesture of friendship.  It is unclear what prompted Mr. Bello's later messages asking if Ms. Riviere was alright and if she was upset with him, but it is clear that Ms. Riviere told him that she was a busy single mother working two jobs and would reach out when she had time.

In a lengthy message sent on February 14, 2022, Mr. Bello explained that he cared about Ms. Riviere "but not in a way to get into any kind of intimate relationship."  He stated that it appears that she is afraid to talk to him.  Ms. Riviere responded that she did not have the energy or emotional capacity for a friendship and wished him a happy Valentine's Day.  When Ms. Riviere blocked Mr. Bello from her Facebook account in February of 2022, he told her he was hurt and wished she had communicated with him.  He ended by wishing Ms. Riviere "all the best."

---

[1] The appellant also argues that the trial court erred in issuing an order under the protection for victims of sexual assault act.  We find this argument to be without merit.  The trial judge failed to check the appropriate statute on the uniform protective order form, however, at the conclusion of the hearing, the trial judge stated that Ms. Riviere had "proven her case in order to get the injunction and to get the protection from stalking from Mr. Bello."

The evidence indicates that after Ms. Riviere blocked Mr. Bello from her Facebook account, she continued to see Mr. Bello and dance with him. The evidence is unclear as to what prompted Mr. Bello to send messages apologizing to Ms. Riviere and stating that he never intended to make her uncomfortable. He sent several messages telling her of dance gatherings and hoped she could attend. At the hearing, Ms. Riviere testified that these gatherings were to meet and dance with a group of people.

On October 8, 2022, Mr. Bello sent a message, again stating that he was sorry; he never intended to make her feel uncomfortable and was looking forward to dancing with her the following Saturday. Ms. Riviere responded to this message stating: "We are all good" and "see you then."

In December 2022, Mr. Bello sent a message to Ms. Riviere stating that all dancers would be at Southern Rhythm for New Year's Eve. She responded that it sounded like a "good idea." Ms. Riviere testified that she attended and brought the guy she was dating.

On January 23, 2023, Ms. Riviere sent a message to Mr. Bello asking, "Are you going anywhere tonight?" When questioned about this message, she testified that she was dancing with some friends "of ours, and so I asked him if he was going to be out dancing." She elaborated that she did not have and has never had any issues socially dancing with Mr. Bello.

On February 14, 2023, Mr. Bello sent Ms. Riviere a Valentine's Day greeting stating that she was terrific and he was thinking of her. She responded by thanking him and putting a heart emoji into the message.

On March 9, 2023, Mr. Bello sent a lengthy text message stating how much he enjoyed dancing with her and wanted to improve his dancing. He said that her "going to Fleur de Dance" impacted his showing up there for the past two weeks, but he would have gone there eventually anyway. Mr. Bello wanted to talk to her

and did not understand why she was afraid to speak with him. He asked that they feel "comfortable and relaxed around each other" and be able to have fun.

On March 10, 2023, Ms. Riviere sent a strongly worded text to Mr. Bello telling him to leave her alone and not talk to her, text her, ask her to dance or come to her dance class. Mr. Bello said he would leave her alone and wished her a "good life." The evidence indicates that after the March 10, 2023, message from Ms. Riviere, Mr. Bello had made no further attempts to contact Ms. Riviere in any manner. The court served Mr. Bello with the TRO; he stopped going to Rock N Bowl and hired an attorney to refute the allegations against him.

La. R.S. 14.40.2(A) defines stalking as "the intentional and repeated following or harassing of another that would cause a reasonable person to feel alarmed or to suffer distress." The evidence indicates fourteen text messages or exchanges on social media over eighteen months. During this time, Ms. Riviere continued to see Mr. Bello and dance with him. While the messages admitted into evidence show Mr. Bello's persistent attempts to have a closer relationship with Ms. Riviere, Ms. Riviere's responses and actions did not indicate that she wanted Mr. Bello to stop contacting or dancing with her. Instead, the evidence shows that Ms. Riviere continued to dance with him and respond to his messages in a friendly manner. She admitted to going to events that he invited her to attend. At the hearing, Ms. Riviere testified that Mr. Bello knew his actions were making her uncomfortable, yet he continued contacting her. However, the messages indicate that Mr. Bello gave Ms. Riviere numerous opportunities to explain what made her uneasy, and she failed to do so. Instead, she told him she was busy and would reach out when time permitted, that she did not have the emotional energy for a friendship, and that "we are all good." The evidence shows that although Ms. Riviere blocked Mr. Bello from sending her messages via Facebook, she did not block him from sending messages on her cell phone.

Six weeks before filing the petition for protection, Ms. Riviere sent Mr. Bello a message asking if he was "going anywhere tonight?" She testified that she sent this message because she was dancing with "some friends of ours and so I asked him if he was going to be out dancing." She elaborated that she did not have and has never had any issues socially dancing with Mr. Bello. Had Mr. Bello's behavior constituted stalking, i.e., "the intentional and repeated following or harassing of another that would cause a reasonable person to feel alarmed or to suffer distress," Ms. Riviere would not have continued to respond to his messages positively or, more importantly, would not have continued to go to places where she knew he would be and to dance with him, if his behavior caused her "to feel alarmed or to suffer distress." In addition, although Ms. Riviere filed an "affirmation" stating that she believed that "the defendant poses a threat" to her safety, she testified that for a year and a half, she continued to go to places where she knew he would be and to dance with him. Further, although Ms. Riviere stated in the petition for protection that she could provide witness statements regarding Mr. Bello's "bizarre behavior" and that dance class instructors "requested [she] seek out a restraining order after also witnessing his behavior," Ms. Riviere presented no such evidence.

The Louisiana Supreme Court has established a two-part test for the reversal of a fact-finder's determinations: (1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State through Department of Transportation & Development, 617 So.2d 880, 882 (La. 1993). On appeal, the reviewing court must do more than simply review the record for some evidence that supports or controverts the trial court's finding. Id. The issue to be

resolved by a reviewing court is not whether the trier of fact was right or wrong but whether the fact-finder's conclusion was reasonable. Id.

A careful and thorough review of the record before us, in its entirety, indicates that the record does not support the trial court's finding that Ms. Riviere carried her burden of proving the allegations alleged in the petition for protection by a preponderance of the evidence. La. R.S. 14:40.2 provides a reasonable person must suffer "alarm" or "emotional distress" for a protective order to be issued. La. R.S. 14:40.3 defines cyberstalking as requiring the purpose of "threatening, terrorizing, or harassing" a person. The evidence presented by the plaintiff does not meet these definitions. The plaintiff's petition and testimony stated that the defendant's actions made her "uncomfortable." Louisiana law does not provide a protective order for actions that make one "uncomfortable." Accordingly, the trial court abused its discretion and committed manifest error by issuing the protection order.

## CONCLUSION

For the previous reasons, we reverse, recall, and vacate the trial court's ruling which issued a protective order against Bernd Bello.

**REVERSED; ORDER VACATED**

MELANIE RIVIERE                           NO. 23-CA-372

VERSUS                                    FIFTH CIRCUIT

BERND BELLO                               COURT OF APPEAL

                                          STATE OF LOUISIANA

**SCHLEGEL, J., DISSENTS WITH REASONS**

I respectfully dissent.

During the hearing, Ms. Riviere alleged that Mr. Bello became obsessed with her during the two-year period they country danced together. She further testified that despite her multiple rebuffs, he continued to make "unwanted advances romantically and/or requesting friendship." To support her allegations, Ms. Riviere testified about several incidents and communications that made her uncomfortable and produced numerous text messages/exchanges between the two of them. Ms. Riviere also revealed during her questioning of Mr. Bello that she had purchased a gun and security cameras, and that she cannot be home alone anymore because she is in fear of her life.

The standard of review for an appeal from a protective order was set forth in *Oliva v. Jones*, 22-385 (La. App. 5 Cir. 3/29/23), 360 So.3d 573, 578, as follows:

> An appellate court reviews orders of protection against abuse for an abuse of discretion. Much discretion is vested in the trial judge, particularly in evaluating the weight of the evidence which is to be resolved primarily on the basis of the credibility of the witnesses. In matters of credibility, an appellate court must give great deference to the findings of the trier-of-fact. The trial court sitting as the trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error. When a conflict in the testimony exists, reasonable evaluations of credibility and reasonable inferences of fact made by the trial court are not to be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are just as reasonable. To reverse a fact-finder's determination in an action seeking a protection from abuse order, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Whether to grant a protective order, and the extent of protection, are within the discretion of the trial court, and an appellate court will not ordinarily modify

or reverse a trial court in such matters absent an abuse of the trial court's discretion.

(internal citations omitted).

Thus, in a case such as this, where the demeanor, body language, and ultimately, the credibility of Ms. Riviere and Mr. Bello are critical to the court's findings, I do not believe that we can say the trial court was clearly wrong or that the trial court abused its discretion.

I appreciate how the majority, or others, could read the text exchanges between Ms. Riviere and Mr. Bello and conclude that the entire situation was a simple misunderstanding based upon perceived mixed signals, i.e. heart emojis and texts initiated by Ms. Riviere. But if someone read those same text messages and considered the other actions of Mr. Bello, such as him sending flowers to Ms. Riviere's home, showing up at her dance studio, believing that they had been friends for 30 years, and asking her out 22 times via Facebook messenger, then it would also be reasonable for them to conclude that Mr. Bello was stalking/harassing Ms. Riviere. Text messages are inherently difficult to understand because of the lack of tone and as a result, should not be read cold. They should be considered in context and in conjunction with witness testimony.

Accordingly, I would find that the trial court's conclusions were not clearly wrong and affirm the trial court's decision. The trial court is in the best position to weigh the evidence and judge the credibility of the witnesses.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**MAY 17, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT
REPRESENTED BY COUNSEL, AS LISTED BELOW:

_____
**CURTIS B. PURSELL**
CLERK OF COURT

## 23-CA-372

**E-NOTIFIED**

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE E. ADRIAN ADAMS (DISTRICT JUDGE)
T. CAREY WICKER, III (APPELLANT)          THOMAS C. WICKER, IV (APPELLANT)

**MAILED**

MELANIE RIVIERE  (APPELLEE)
209 TULLULAH AVENUE
RIVER RIDGE, LA 70123